Now if the attorneys for the parties in the Wilkins-Williams case would please approach the podium and tell us who you are and who you represent. We'd appreciate that. For the Appellant. Good afternoon, Your Honors. My name is Lynn Dowd for the Appellant here in Wilkins and I'm here along with Trial Counsel Christopher Lawler. Appellee? I'm sorry, go ahead. Go for it, please. I'm sorry? Go ahead. Alyssa Ryder on behalf of the defendants Appellees, Rhonda Williams and Superior Air Ground Ambulance Services. Each side is 15 minutes. You see we're moving along. We don't normally look at our watches but we have four orals today. You can argue as long as it makes sense and you're not repeating yourself. So any time you're ready to step. May it please the Court. Again, for the record, my name is Lynn Dowd and I represent the Plaintiff Appellant Karen Wilkins. And at issue today is what I respectfully submit as an issue of first impression, whether the Emergency Medical Services System Act shields the defendants from liabilities for injuries sustained by a nonpatient third party while the ambulance was driving without its lights or sirens on. I submit the answer to that question is no and that the two facts that are critical for the Court's consideration today are the status of the victim, the fact that she was a nonpatient, not within the ambulance, and that the ambulance was driving without its lights and sirens on. This intersection where it occurred there on 95th Street, I take it that particular intersection, is it correct, is not controlled by traffic light, not red green light, right? Is that correct? From my read of the record, I believe there was. The traffic was backing up from a stop light. They were somewhat back from the light. Okay. It was eastbound and westbound traffic. I understand it, having driven by thousands of times. Oh, you mean where she was actually traversing her turn, Your Honor? Right. Oh, yeah, yeah, yeah. That's how it worked. Yes. Like any large boulevard or large street, you'll have street lights here and the traffic will back up for blocks. Correct. Meanwhile, there are intersecting blocks where you can make a right, make a left, but there are no traffic lights there. Correct. So the question is, did this accident occur at the street where there was a, where the accident occurred, did it have a traffic control device or not? Was it further back here? It was further back. There was not a device. It's my understanding that the plaintiff was making a left turn into a parking lot, going to a medical office to pay a bill. Oh, very good. Okay. Okay, great. Okay, a couple other facts I'd like to highlight. First, I know the Court has the formidable task of reviewing this case under de novo review, so I'd like to highlight paragraph 8G of our complaint, where that is where we initially alleged that the defendants were negligent in the operation, maintenance, and control of the vehicle at issue, the ambulance. Some facts are undisputed, that this was a non-emergency transport of a psychiatric patient. Vernette Henderson was the emergency medical technician in the back of the ambulance, and there is testimony by her that early on she checked the patient's vital signs, and then she rode in the captain's chair. Rhonda Williams, however, at all relevant times, acted as just the driver of this ambulance, and she admitted in her deposition testimony that she hit the plaintiff. Some other points of agreement, Your Honor, in getting to the important issues today are First of all, the statute at issue, which the EMSS Act, I'll refer to, clearly applies to emergency situations when a patient, the party being transported, has sustained injuries. I think the case law is clear on that. Where it gets unclear is this particular set of facts before the Court today, whether it provides a shield from liability against the lawsuit my client filed. And I think the Court always has to start by looking at, of course, the language of the statute and the case law interpreting it to determine the purpose. I think a careful examination of the statute and the cases reflect that the purpose is consistent. And many, many cases that we've all cited in our briefs delineate the purpose, and I'm just going to reference the Brock opinion for ease, and that's it. I'm sorry, let me interrupt you. Is there anything in the legislative history of this that would be enlightening to the Court? I think the legislative history was discussed in the cases. I have, I don't know if there's anything outside of that. I mean, you know, that's always a challenge for us as counsel, whether to proffer that, whether it has any evidentiary value or whatever. But it is discussed within the cases. And again, looking at the Brock case, and there's two of them, the first one, 287 Illab III at 16. I'm going to first refer the Court to page 19, where the Court discusses the purpose is, the purpose of this statute was to promulgate a system, an emergency medical system, to provide pre-hospital care. That is, quote, emergency medical services rendered to emergency patients. That's important. Further in the Brock decision, going to page 22 of the decision, the Court says, after reviewing the language and purpose of the statute, the Court has determined that the EMS Act applies specifically to providers of emergency medical services. And then finally, towards the end of the statute, and Your Honor, this may answer your question, we're going down to pages 27, 28 in the decision, the by trained medical personnel without the risk of malpractice liability for every bad outcome or unfortunate occurrence. And then if we look at the statute itself, it states, the immunity is provided for emergency or non-emergency medical services. And then later on it says, or in an emergency, the providers shall not be civilly liable as a result of their acts or omissions in providing such services. Obviously, to whom are they providing the services? The patient in the ambulance. There's nothing in the statute or in the case law interpreting it that says they get immunity against the world for negligent conduct that has nothing to do with the provision of medical services. Now, in reviewing today, in reviewing the record as the Court has, I'd also like to refer the Court to some important testimony from Ms. Williams, because I think her status as a driver, and again, keeping in mind the conditions under which this ambulance was traveling, it was dark, it was around 7 o'clock at night, clearly a congested area, busy intersection, traffic was backing up. There's testimony in the record that the lane in which the ambulance was traveling was on the outer lane. The two inner lanes were stopping, if not stopped, and that's where the inner and center lane stopped completely to allow my client passage for her left turn. But even though this traffic was stopping and stopped, the ambulance continued at what I submit was a pretty hefty pace for these conditions, between 30 and 40 miles per hour. Those are important facts. And with that in mind, I'd like to refer the Court to Ms. Williams' testimony in her deposition. This is at page C384 in the record. Specifically, pages 24, 29, on page 24, lines 18 through 24, and on page 25, lines 2 through 7. And I'd like, if the Court permits, to read those into the record, because they're important. The question to Ms. Williams was, let me ask you if you think Vernette, or excuse me, this is Ms. Henderson. Vernette, I'm sorry. These are questions to Ms. Henderson. Let me ask you if you think, Vernette, were there any rules when you were approaching an intersection that was busy that you had to slow down or anything like that? We were told to drive as if we would normally drive our personal vehicle. So if we came to an intersection, we would slow down, stop if need be. Question. This is when you're not operating an ambulance in an emergency service mode, correct? Correct. So would you drive under the rules of the road as if you were driving your own car? Correct. So she admits that when not operating as an emergency vehicle, her training and understanding was to operate the vehicle in conformity with the rules of the road, the Illinois Motor Vehicle Code. So then if we go to page C353 in the record, the question is, okay, let me ask you this. I'd just like to check one point, Your Honor, because I want it to be perfectly clear. I pulled this out. Okay, this is Rhonda Williams. This is Rhonda Williams' testimony I'm about to read into the record. And again, this is lines 10 through 14 on what's page 21 in the original transcript. Question. Let me ask you this. If you know, in terms of the sirens and lights, are there certain times where you are required by law to activate the sirens and lights? Her answer, not sure by law. She didn't know what her obligations were when she was not under lights and siren. What does that have to do with, if I can ask you, counsel, the question is the breadth of the EMS Act. Right. And the other side, the ambulance side, says that when you look at the American National Bank, which said it would include preparatory things, would include things which have nothing to do with life support. They say DeBruzzo versus Park Ridge, another EMS Act, where it's extremely broad. An American nationally arrived at the scene of a 15-year-old who's unresponsive. He's a narcotics addict or has a substance use disorder at first. They looked at him and he drove away. And it was covered. DeBruzzo, they couldn't find the person. It was covered. Again, you're right in both those. Those are patients, so they were supposed to be the ones looked at. But why wouldn't it cover this, since it does discuss transporting people? Because I think the answer can be found in the purpose that I've articulated in the language of the statute, that the statute applies to the, with respect to the rendition of the emergency services, so that there's not a chilling effect that the paramedic sustains when providing those services. And as we can all, we can come up with a million, or millions a little bit, we can envision some hypotheticals where patients being transported in an emergency condition are in a fragile state, you hit bumps on the road, they're trying to get you to a hospital, and so you might sustain additional injuries. There's a need to, that these people have to have with respect to the patient to do their jobs. But, Your Honor, this is where I think the other part of the answer can be found. And based on Ms. Williams' testimony, the Illinois Motor Vehicle Code, she didn't know. Really, at this time, when they were not under lights or siren, they were not operating as an emergency vehicle. They were just a vehicle in the dark, like any other car on the road. There's no reason, unless they're under lights or siren, even if they're transporting a patient, that they should get the benefit of this immunity statute. And here's why. Because the Illinois Motor Vehicle Code specifically says that ambulances, ambulance drivers, have a duty to put their lights and siren on when conditions warn it. I think here's the big question of fact. Number one, under these conditions, congested, dark, did conditions warn putting your lights and siren on? Absolutely. Had they done it, I submit a jury could find this accident never would have happened and that's negligent. But more importantly, we have two statutes here, the Code and the Immunity Statute. Clearly the legislature did not seek to promulgate a conflict in the law. These two statutes, if our position and our interpretation as we proffered is accepted, are completely consistent. The driver who's not rendering emergency medical services has a duty to act reasonably given the circumstances. And her failure to put on the lights, I don't care what her training was, the law is the law. Based on the conditions, she had a duty to put the lights and siren on. Only, you know, had she done that, she would have been acting as an ambulance driver. And then maybe she might be able to assert the benefits of the immunity statute. Let me ask you this. In this case, this was not an emergency situation. It was a transfer of a patient. So you're asking in the facts of this case that we should not allow that immunity to go forward, that negligence should be the standard. Would you suggest as well that if it were an emergency situation, what would be the liability there to third party  Excellent question, Your Honor. Thank you. Because I've actually thought about that. I, in preparing for today, I was thinking of three scenarios, trying to see what the court might ask me. The first being, let's say this ambulance was under lights and siren and we had this collision. I don't even think we get to the immunity statute. Because under the Illinois Motor Vehicle Code, that ambulance has the right of way. My client, if she got in an accident with that ambulance under lights and siren, there's no cause of action. Ambulance has the right of way. Scenario number two, no lights and siren, nonpatient. Here we are with this unique set of facts. And they're seeking, they're seeking just because the driver was in an ambulance that nobody could see, she has some immunity that the world doesn't know about. That's, that goes against everything the law stands for, for putting people on notice, reasonable, foreseeable conduct. Traffic slowing down, you know, you have an obligation to drive reasonably. And I think that's scenario number three. If this wasn't an ambulance and just another car or van, clearly we have a lawsuit that goes to a jury. So the real question for the court to hone in on, just because she was in an ambulance, do they get absolute immunity against liability incurred by their negligence and their willful and wanton conduct? Motor Vehicle Code says there's nothing that relieves the driver of an ambulance from acts of negligence, negligence or willful and wanton conduct. The legislature had both statutes around for decades. They could have cross-referenced them. They could have said in the EMS, which they amended a couple times, that it applies to drivers. They could have said in the Motor Vehicle Code that there's some type of immunity. They didn't give that to drivers. So I think we, you know, we, the law is, the legislative scheme cannot be promulgated to create a conflict that they have to be interpreted consistently. And our position gives consistent interpretation. But minimally, and this brings us to however the court interprets this statute, I think, I submit this record has enough facts in it to support a willful and wanton cause of action, and that should go to a jury, minimally. But I think your complaint specifically alleged a willful and wanton. No, it does not, Your Honor, and I will answer that. May I just make a couple points on that? Because it's an interesting procedural issue. We filed the complaint, counsel filed the complaint, never thought the statute applied. So there's no reason to plead willful and wanton. Who thought the statute didn't apply? I'm sorry? Who thought the statute didn't apply? Counsel drafting the complaint representing the plaintiff. The plaintiff's counsel. Yes. Okay. Then the defense files their answer. An affirmative defense. Alleging where EMS acts as. Right. And so then the issue becomes. Or under willful, wanton, and. I understand. And so then the issue becomes, is there a need or an obligation to raise an affirmative defense to an affirmative defense? And I submit, in retrospect, maybe that would have been the better practice, but the case law is abundant that affirmative defenses can be raised by way of summary judgment proceedings. Dozens and dozens of cases that say that. Because again, the fundamental question is always, did the trial court have an opportunity to pass on this argument? And it did. The willful and wanton argument was four corners of the summary judgment proceeding. And again, the court's interpreting this law and the record de novo. And I submit there are facts to support a willful and wanton cause of action. Unless the court has any further questions, we would respectfully request a reversal on the merits. Thank you, Ms. Backer. Thank you very much. May I inject? The trial court granted the summary judgment motion based upon their opinion that the act provided immunity to third parties. That's correct. Thank you. Yes. Ms. Reiter. May it please the court. If the purpose and the reason for the EMS Act is to be given any real effect, then it has to apply in this circumstance. And I'd like to first state why I think that generally. But I also think that during the appellant's argument this morning, we've gone somewhat astray from what the real issues are as they were presented and as they should be looked at in this case. And I'd like to try to get us back onto the right track. The EMS Act has been recognized by our Supreme Court as a comprehensive scheme to regulate the provision of services by emergency responders throughout the state. The Supreme Court in both the American National case and the Abruzzo case recognized that it's an extremely comprehensive act. It covers everything from the licensing of ambulances, what sort of equipment they need, the licensing of the EMTs, the scope of the EMT services. All of that is encompassed in the Act. The Act then has this immunity section. The immunity section recognizes that EMTs and other emergency responders are dealing with medically fragile patients, which is why they need medical transports as opposed to just any other car or cab. They're dealing with medically fragile situations, even when they are operating in a nonemergency medical transport situation, there's always the chance that that patient in the back of the ambulance who is being monitored, whose vital signs are being checked, who's receiving that sort of medical care and attention, there's always the chance that that can turn into an emergency at any time. And it's a high-risk profession, potentially, and the Brock case that was cited recognized that we want to encourage residents to become emergency responders, become EMTs. It's an important function for our state. And unless these EMTs can operate with this sort of limited immunity, then they will be discouraged from entering the profession and they will be impeded in doing their job. And that's true whether we're talking about the patient who's receiving the services or a third party. Well, that's the issue before us. I mean, clearly the statute and the case law interpreting it has provided immunity from claims by patients. That's not the issue here. As to whether or not the statute, indeed, is silent on that point. Well, if you're asking if it explicitly references third parties, that's correct. So it's silent. I would say that it's implicit in the statute that it applies to third parties. Here's one reason why. Is it implicit that the driver of this emergency or non-emergency situation can act like a lunatic on the highways and drive on the wrong side of the road? Well, driving like a lunatic would... And then crash into a vehicle, and crash into an oncoming vehicle? Driving like a lunatic... Are they absolved from liability in that instance? No, because I would say that driving like a lunatic would probably qualify as willful and wanton conduct, which is not within the immunity. That's accepted from immunity. Now, the vehicle code says that even the emergency operation of an authorized vehicle, that driver must maintain a due regard for the safety of others. Correct. And I think that just highlights why it's important to have this immunity, because these ambulances... So you're saying we want this immunity for claims by third parties, and we're going to excuse them from maintaining a due regard for the safety of others. Isn't that what you're saying? The vehicle code no longer applies. Only the EMS statute. No, I'm not saying that at all, because if you look, for example, and this brings up an issue that the plaintiff has raised now as a highlight of their argument, although it was not really raised below, which is that all of this hinged on whether the lights and sirens were on. So if you look, for example, at a portion of the traffic code, 625 ILCS 5-12-215, it basically provides that vehicles are prohibited from using flashing lights unless there's certain exceptions. One exception is if you're an ambulance that's actually in an emergency situation. So first of all, just to clarify something the appellant's repeated raising of this issue, the driver cannot just simply turn the flashing lights on. It has to be required under the vehicle code. Yes, the drivers do have to comply with the vehicle code, and the vehicle code, if you look at various sections, for example, that section, there's 5-12-601.1 that deals with traffic control signal preemption devices, and there's 5-11-1421 conditions for operating your vehicle. Each of those statutes, and I'm sure there are others, I just wrote down a few as examples, each of those recognizes that you have a responsibility to follow the rules of the road, and there's limited exceptions. And if you're an ambulance under the Act, and if you're responding to an emergency, then you do get certain exceptions, like you don't have to make a full stop at a stop sign, or you can exceed the speed limit. But you're still supposed to use due care. So those conditions are still imposed on the driver. Now, if the driver doesn't follow that and does so willfully, wantonly, then they won't have immunity. But the fact that the driver may have to drive under these conditions, it just highlights why it's important that they have this immunity, because they are often called upon to drive under, in a manner and under circumstances that are different than a regular driver of just an ordinary vehicle. Not to mention that they're driving while a foot, two feet behind them, there is a patient who is undergoing or who's being attended to and receiving medical care and services. Counsel, isn't the whole basis, the foundation of this Act, the fact that we want to provide some kind of protection for these people that do go into the area of EMT or EMS and provide these services? We want to chill that profession. We want these people to go into it and realize that they're not going to be sued for every little thing that a patient or a transfer person, whatever, may bring against them. Are we concerned at all about the third parties? Are we concerned about the patients suing them more than third parties suing them? What's The plaintiff has essentially admitted, although now they're saying it depends on whether it's emergency versus non-emergency, which I'll hopefully get to in a minute as well, but they've admitted that the Act applies when you have an emergency situation involving the transportation. But if you think about it, if we are going to carve out liability to third parties, then we're exposing the EMTs to the very risk that we're saying they're supposed to be protected against because when you're driving, you're on the public roads and you're driving with the rest of the public and most accidents are not single-car accidents. Would it make any difference if there was not a person in that ambulance? Yes. That would make a difference. Clearly. Yes. And the difference here is that there was a person in the ambulance, but there was no emergency situation. So if that person was in that ambulance, that changes the level. No. What changes it is that there was non-emergency medical transportation going on, and that's what the statute references. The statute applies to anyone who in good faith provides emergency or non-emergency medical services in the normal course of conducting their duties, then they're not civilly liable as a result of their acts or omissions in providing such services, which includes the non-emergency medical services, unless the acts or omissions are willful and wanton. And then when you look at what non-emergency medical service is, the statute, which is 3.10 subsection G, says that it is medical services rendered to patients whose conditions don't meet the definition of emergency during transportation of such patients to health care facilities for the purposes of obtaining health care services which are not emergency in nature using a vehicle regulated by this act. And if you look at that American National case, although it was an intended patient at issue there, what the court talks about is that the transportation of the patient is part and parcel of the services that were rendered to the patient at issue. And that's why the court takes the next step in that case and says, well, if transporting is part and parcel of the services, then certainly locating the patient in the first place is part and parcel of it. So I think that our Supreme Court has made it clear that the transportation part of this is encompassed within the act. Now, I wanted to point out one thing. The appellant was referencing the Brock case and the intent of the legislature. Brock was quoting a prior version of the statute dealing with legislative intent. There is a statute in the EMS Act, it's section 50-2, called legislative intent. The Brock case was looking at an older version. The newer version, the one that's applicable to our case, the court, I'm sorry, the legislature specifically included the phrase non-emergency medical transports within the statute. So that now it is clear explicitly that it's the intent of the legislation to provide systems for emergency medical services within the state. And it talks about it's for the purpose of coordination and integration of all activities within the state concerning pre-hospital and inter-hospital emergency medical services, as well as non-emergency medical transports, and the overall planning, evaluation, and regulation of pre-hospital emergency medical services systems. So our Supreme Court and our legislature has... And again, that does nothing, nothing to enlighten us as to the silence of the act as to claims by third parties. This is a novel case. Well, I think we should look to the tort immunity cases, though, to get some guidance. Because if you look at the tort immunity cases, particularly the ones, there's all different immunity sections within the Tort Immunity Act. But if you look at the ones in particular that deal with section 2-202, that's the section that talks about having immunity for acts or omissions in the execution or enforcement of any law. Well, if you look at all the cases that involve, for example, high-speed chases, and this is the typical scenario, right, where the police officer is chasing the suspect, and what the plaintiffs here would call the innocent third party is the one who ends up getting hurt as a result of the high-speed chase. In those cases, and we cited just a few of them in our brief, Shuttlesworth, Erb and Breck, and I'm sure there's many more. But in each of those cases, the court never questioned whether the third party, whether the immunity applies to the third party, although that statute also doesn't explicitly say you have no liability to anyone, including innocent third parties who weren't the ones that were the intended object of your enforcement of the law. If you look at all those cases, the court looks only at, was the police officer enforcing the law? Yes. As to the suspect, he was enforcing the law. He was trying to arrest him or pursuing him, whatever he was doing to enforce the law as to that suspect. That innocent third party, it really had nothing to do with them. But the courts haven't hesitated to apply the immunity statute in that context to third parties. And But isn't that because the purpose behind the Tort Immunity Act is to immunize government actors. We, the government, there's many, many reasons why governments shouldn't be sued at all because the taxpayer is not picking up the tab. Is that same underlying principle or good principle, I'd suggest, that exists when you're having a private ambulance service? And I agree with you. I mean, having written Williams v. Evanston, an ambulance car crash, and the cases therein, and the Shuttlesworth and recent Illinois Supreme Court case, the high-speed chases, there's reasons. Do those same reasons apply that our municipalities should not have to pay crippled people, even when they cripple them, apply to private ambulance services when they cripple people? Well, the financial aspect of it might be different. What you're saying is that the statute is a different purpose, which is equally important. And that is the one recognized by the legislative intent and recognized by our courts that have interpreted the statute, which is that providing these sort of services is an important function in our state. And we have to encourage people to become emergency responders. And we recognize that they are working in often very exigent circumstances, and so it's important to provide this immunity in recognition of that. And let's not forget as well that these, the ambulances, they're governed by the Department of Public Health. There's a very strict regime of administrative codes and statutes about how they have to operate. And these EMTs are subject to suspensions or fines if they don't operate properly. This isn't just, because it's a non-emergency transport, this is not the same as just any old car driving down the street. There are regulations as to what has to be done, and they're subject to that. And the quid pro quo of that is that there's this limited immunity. I wanted to clarify some other points that were made. The fact that the plaintiff filed a response to our motion for summary judgment on the willful and wanton issue does not mean that that issue was preserved. There's black letter case law in Illinois that provides that if an affirmative defense is pled and on the right to plead around that, which the plaintiff never did, and so they never, they never preserved the issue properly. The, well, I will rest on our briefs for the remainder of the issues unless the Court has any questions. We'd ask you to affirm the judgment. Thank you. Ms. Dowd, very briefly, please. Thank you, Your Honors. I will be brief. Couple of points I'd like to make. I agree with counsel that because this was a non-emergency transport, it's not the same as all the other cases. With respect to the Tort Immunity Act cases, specifically the Williams v. Brown, there the police car was under lights and siren. And that is very important, and I'm going to tell you why. Where the EMSS Act is silent, the Illinois Motor Vehicle is screaming out why this has to go back to the jury. Counsel referenced section 625 ILCS 5-11-1421. I would refer the Court to this, and that deals with the conditions for operating ambulances and rescue vehicles. And I'm going to be very brief. I'm going to read the statute. It states, the aforesaid siren and lamp or lamps shall be in operation at all times when it is reasonably necessary to warn pedestrians and other drivers of the approach thereof during such trip or journey. Doesn't matter the reason. If the conditions out on the road warrant lamps or siren, it's mandated to turn those on. Minimally, Ms. Williams, the driver, had this obligation. Possibly, you know, there might be, we could separate Ms. Henderson in the back from Ms. Williams, but Ms. Williams was not providing any medical services. She was a driver subject to this statute. Section 5B also says, the foregoing provisions do not relieve the driver of an ambulance or rescue vehicle from the duty of driving with due regard for the safety of all persons nor do such provisions protect the driver from the consequences resulting from the reckless disregard for the safety of others. This statute, this provision in the Motor Vehicle Code clearly, I submit, removes any argument that there's immunity for the driver for negligence or willful and wanton misconduct. That statute is screaming out that this goes back. Had the legislature intended to give immunity, they could have done it there or they could have cross-referenced the statute. They didn't do it. This case had no exigent circumstances and with regard to any questions regarding waiver, as the court well knows, at most, at best, it applies to the parties, not to this court. We're here on behalf of the plaintiff. She's seeking substantial justice. That's this court's role. She would like her day in court based on this court's de novo review of the record. I thank you very much. Thank you. This case will be taken under advisement.